UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARGARET M. JEFFREY,

           Plaintiff,

   - against -

DEUTSCHE BANK SECURITIES INC.,

           Defendant.

04 Civ. _____

**COMPLAINT**

PLAINTIFF DEMANDS
TRIAL BY JURY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Margaret M. Jeffrey ("plaintiff" or "Jeffrey"), by her attorneys, Vladeck,

Waldman, Elias & Engelhard, P.C., complaining of defendant Deutsche Bank Securities Inc.

("Deutsche Bank" or "defendant"), alleges:

<u>NATURE OF CLAIMS</u>

       1.    This proceeding is brought to remedy defendant's unlawful interference

with the exercise of plaintiff's rights pursuant to the Family and Medical Leave Act, 29 U.S.C.

§ 2601 <u>et seq.</u> ("FMLA").

       2.    Plaintiff also seeks to remedy discrimination on the basis of sex and

pregnancy in the terms, conditions and privileges of employment in violation of the New York State

Human Rights Law, New York Executive Law § 296 <u>et seq.</u> (the "Executive Law"), and the

Administrative Code of the City of New York § 8-107 <u>et seq.</u> (the "Administrative Code").

       3.    Injunctive and declaratory relief, damages, statutory penalties and other

appropriate legal and equitable relief are sought.

213932 v1

### JURISDICTION AND VENUE

4.     Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

5.     The Court has jurisdiction over plaintiff's FMLA claims under 29 U.S.C. § 2617(a)(2) and 28 U.S.C. § 1331.   The Court has diversity and supplemental jurisdiction over plaintiff's Executive Law and Administrative Code claims pursuant to 28 U.S.C. §§ 1332 and 1367. The parties are of diverse citizenship and the amount in controversy exclusive of interest exceeds $75,000.

6.     Venue is proper in this District pursuant 28 U.S.C. § 1391, because the events giving rise to this action occurred, and defendants do business within, the State of New York.

7.     On or about June 30, 2004, plaintiff filed a charge of discrimination with the United States Equal Opportunity Employment Commission.   When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.. The facts set forth herein are relevant to that claim as well and therefore, there will be no prejudice to defendant by this procedure.

### PARTIES

8.     Plaintiff Margaret M. Jeffrey is a citizen of the United Kingdom.  She was employed by Deutsche Bank from May 2000 until February 14, 2004.

9.     Upon information and belief, defendant Deutsche Bank is a financial services corporation that is incorporated in the state of Delaware and has its principal place of business in the state of New York.  Upon information and belief, Deutsche Bank employs more

than 50 employees at its offices in New York City.  Deutsche Bank is an employer within the meaning of the Executive Law, the Administrative Code, and the FMLA.

FACTUAL ALLEGATIONS

10.     Plaintiff graduated from Strathclyde University in Scotland in 1986 with a degree in economics.

11.     Plaintiff worked for Dean Witter Reynolds in London from 1986 until 1990 in the U.S. Equity Sales Division.  From 1990 until 1995, Jeffrey worked for Goldman Sachs in London as a member of the U.S. Sales Desk, and then as the Head of Latin American Equity Sales.  From 1995 until 1999, Jeffrey worked for JP Morgan in New York and London.  At JP Morgan, she was a founding member of its U.S. Equity Sales Desk in London, and was promoted to Director of Marketing and Co-Head of U.S. Equity Research.

12.     In May 2000, plaintiff joined Deutsche Bank's New York office as a member of its North American Equities Management Committee, with the title of Director of U.S. Equities Marketing.   There were twelve members of the North American Equities Management Committee, and Jeffrey was the only female member.  She reported to David Dipietro ("Dipietro"), Head of North American Equities, and Vikas Nath ("Nath"), Global Head of Equities Marketing.  Upon information and belief, at the time that plaintiff began working at Deutsche Bank, there were approximately 250 Managing Directors in Global Equities, less than five of whom were women.

13.     The primary objective of plaintiff's job as Director of U.S. Equities Marketing was to develop awareness and understanding of the annual survey conducted by Institutional Investor, a magazine covering the global financial community.  In its annual survey, Institutional Investor ranks, among other things, financial analysts and research teams.  Plaintiff's

responsibilities included building and directing a strategy that would allow Deutsche Bank to improve its rankings in the survey. Jeffrey's compensation package consisted of $150,000 in base salary, $500,000 in guaranteed bonus, and $250,000 in a sign-on stock bonus.

14.     Nath left Deutsche Bank in October 2000, at which time Jeffrey reported solely to Dipietro.

15.     In November 2000, Russell Duckworth ("Duckworth"), Global Head of Equities Research, and Scot Six ("Six"), Deputy Global Head of Equities Research, requested that Jeffrey expand her responsibilities to include an Institutional Investor marketing campaign and polling activities on a global basis.

16.     Jeffrey discussed with Duckworth and Six an increase in her compensation that would be commensurate with the increase in her responsibilities. They discussed compensation in the range of $1,100,000 to $1,300,000. They also discussed promoting her to Managing Director.

17.     In December 2000, Dipietro gave Jeffrey an excellent performance review. He increased her incentive compensation from $500,000 to $570,000, bringing her total compensation for 2000, including the sign-on stock award that would vest in 2002, to $970,000.

18.     In January 2001, Jeffrey began reporting to Six. She continued her Institutional Investor marketing campaign in the United States, and began work on Institutional Investor marketing campaigns in Asia and Europe.

19.     In March 2001, Jeffrey informed Six and Duckworth that she was pregnant. Shortly after that, in April 2001, Deutsche Bank hired Michael Riley ("Riley") as Global Head of Research Marketing, with a title of Managing Director. Jeffrey was directed to

report to Riley, who reported to Six.   In addition, after Jeffrey announced her pregnancy, Deutsche Bank reduced Jeffrey's responsibilities and unwarrantedly criticized her performance.

20.   For example, Riley told Jeffrey to cancel a trip she had planned to Europe in April 2001 to discuss marketing plans with the Head of Euro Equities Research and other members of the Euro management team.   When the trip was rescheduled in May 2001, Riley accompanied Jeffrey and attended every meeting that she had set up.

21.   In addition, Six told Jeffrey that she should not travel to Tokyo in June 2001 to follow up on the Institutional Investor marketing campaign there.   Six stated that it was too expensive for Jeffrey to make the trip.   Six and Riley, however, traveled First Class to Asia shortly after Jeffrey was scheduled to go, even though such travel accommodations were not allowed by defendant's travel policy.

22.   During the summer of 2001, Riley continued to marginalize Jeffrey's position.   He conducted follow-up meetings concerning the Institutional Investor campaigns in Europe and Asia without including Jeffrey.   He also met with key members of the Global Management Team without including Jeffrey.

23.   Upon information and belief, Deutsche Bank believed Jeffrey would not return to work after her maternity leave, even though she intended to do so.   In or about August or September 2001, John Willis ("Willis"), Head of Global Sector Research, said to plaintiff, "You won't come back after maternity leave, will you?"   Jeffrey responded that she certainly was planning to return to work after her maternity leave.   Several other Deutsche Bank employees were present when Willis made this statement.

24.    In October 2001, the U.S. Institutional Investor annual survey was published. Deutsche Bank exceeded expectations by increasing its ranking from fourteenth place in 2000 to ninth place in 2001.

25.    In November 2001, as defendant was making compensation and promotion decisions, plaintiff discussed with Riley the conversation that she had had the year before with Six and Duckworth concerning increased responsibilities, compensation, and promotion. Riley told plaintiff that she was overestimating the value of her contribution to the firm. He also questioned plaintiff's energy level.

26.    In December 2001, Riley reviewed plaintiff's performance. Riley told plaintiff that she was "shooting the lights out in the U.S." Riley, however, also told plaintiff that people outside of the U.S. did not know who she was or what she did, and that she needed to increase her impact. Riley reduced her compensation to $480,000, consisting of $150,000 base salary and $330,000 incentive bonus.

27.    Plaintiff's son was born on December 6, 2001 and she took a twelve week maternity leave from Deutsche Bank.

28.    On March 1, 2002, Jeffrey returned to Deutsche Bank.

29.    Soon after her return from maternity leave, Jeffrey was told by Paddy Shanahan, a Managing Director in the Equities Division, that senior management of defendant would not view her the same now that she was a mother.

30.    In an effort to respond to Riley's criticism that she needed to increase her visibility and impact abroad, Jeffrey proposed relocating to London for three months. Riley rejected this idea, and instead told Jeffrey to make short, frequent trips to London. However, short, frequent trips were not feasible given defendant's cost restraints and travel policy.

31.    Jeffrey was then instructed by Riley to focus solely on domestic issues. She was successful in this regard.   Deutsche Bank's ranking in U.S. Institutional Investor improved from ninth to eighth and the number of Deutsche Bank's analysts ranked increased from sixteen to twenty.

32.    Riley, however, continued to thwart Jeffrey's attempts to work abroad.  In the summer of 2002, Riley discussed the need to go to Asia to further defendant's marketing objectives. Jeffrey volunteered to travel to Asia, but Riley sent two junior members of their team instead.

33.    In August 2002, Kevin Parker ("Parker"), Global Head of Equities, congratulated Jeffrey on the early positive signals regarding the upcoming Institutional Investor rankings.  Jeffrey asked Parker if he would consider her for a promotion in the next round, and he said that he would.

34.    During the summer and fall of 2002, Jeffrey also requested meetings with Riley to discuss her prospects for promotion.  Riley did not meet with Jeffrey until November 2002. At that meeting he told her that she would not be promoted or considered for promotion.

35.    In January 2003, Riley gave Jeffrey her performance review for 2002. Despite the fact that Deutsche Bank's ranking had improved in the Institutional Investor survey, Riley unjustly criticized Jeffrey's performance.  Riley ranked Jeffrey a "2" on a scale of 0 to 5, with 5 being the highest, for Business and Financial Achievements, one of the four categories ranked.  On the scale used by defendant a "2" ranking was equivalent to "inconsistently meets expectations."

36.    At the end of the performance evaluation in January 2003, Jeffrey told Riley that she was pregnant again.

37.     In February 2003, Jeffrey was told by Riley that her total compensation for 2002 was reduced to $250,000 ($150,000 base salary and $100,000 incentive bonus).

38.     In April 2003, Deutsche Bank requested that Jeffrey's husband, Phillip Anker, a Deutsche Bank Asset Management employee, relocate to London.  Jeffrey spoke with numerous senior managers at Deutsche Bank regarding her desire to also transfer to London. Parker told Jeffrey that there would be an appropriate position for her in London.  Jeffrey and Parker agreed that after moving to London, Jeffrey should contact Deutsche Bank in September 2003 and continue discussions regarding a position in London at that time.  Parker instructed Jeffrey to contact Duckworth and Francois Wat ("Wat"), Regional Head of Sales/Europe, after she moved to London.

39.     Jeffrey told Riley that she would stay in New York to work if an appropriate position could not be found in London.  He assured her that defendant would find a position for her in London.  Riley stated that he would speak to Duckworth, Wat and other senior members of European Management on Jeffrey's behalf.

40.     Jeffrey began maternity leave on July 4, 2003.

41.     In September 2003, Jeffrey moved to London.

42.     In October 2003, Jeffrey met with Duckworth regarding a position in London.  Duckworth told Jeffrey that because of the difficult business environment, there would not be a position for her in the Global Research Department.  He suggested that she send her resume to Michael Cohrs ("Cohrs"), Global Head of Corporate Finance, regarding a potential opportunity in Deutsche Bank's Investor Relations Department.  Jeffrey attempted to contact Cohrs by phone and email, but he did not respond.

43.     On November 9, 2003, plaintiff sent an email to Peter Goldstein, Director, Human Resources, Equities Advisory, regarding her employment status.  She stated that senior management had told her that there would be a position for her within defendant's Equities Division in London.   She said that if that was not true, she would fulfill her current responsibilities from London or commute to New York if defendant paid for her commuting and accommodation expenses.

44.     At the end of her twelve week maternity leave, plaintiff was ready and willing to return to work for defendant, but defendant did not provide her with a position.

45.     In late November 2003, Jeffrey met with Wat regarding a position in London.  Wat said that he would have a better picture of what opportunities would be available by the end of the year, and that he would contact Jeffrey in early December.  Wat did not contact Jeffrey in December and did not respond to Jeffrey's attempts to contact him.

46.     In January 2004, Jeffrey met with Roelfien Kuijpers ("Kuijpers"), Managing Director, Global Head of Strategic Planning, Communication and Marketing, Global Equities Division, regarding a position in London.  Kuijpers said that she was seeking a replacement for the Head of Internal Communications and Marketing for Global Equities. Jeffrey was interested in the position and asked Kuijpers for a job description.  Kuijpers responded by requesting that Jeffrey provide a description of what she thought the job should be.

46.     During the meeting in January 2004, Kuijpers also told Jeffrey that Riley "spoiled the beans" for her in the United States.  Kuijpers said that Riley had destroyed Jeffrey's credibility and that Jeffrey would have to rebuild her career and standing.

47.     Approximately one week after the meeting in January 2004, Jeffrey sent Kuijpers a proposed job description.

48.     Later in January 2004, Kuijpers told Jeffrey that she had determined that the job was too big for one person and that she had decided to divide the responsibilities of the job amongst her team.  They agreed to meet again to discuss hiring Jeffrey for a smaller portion of the initially proposed opportunity.

49.     On or about February 1, 2004, Kuijpers told Jeffrey that Jeffrey would not be right for the marketing position that was available.

50.     Jeffrey was never offered a position in London by Kuijpers or anyone else employed by defendant and she never turned down any such position.  Nonetheless, on February 13, 2004, Goldstein called Jeffrey and told her that because she had told Kuijpers that she was not interested in the marketing position that was available, defendant was terminating her employment.

<u>FIRST CAUSE OF ACTION</u>

<u>FMLA</u>

51.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-50 of this Complaint as if set forth fully herein.

52.     Defendant has interfered with plaintiff's exercise of her rights under the FMLA in violation of the FMLA.

53.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendant's unlawful practices unless and until this Court grants relief.

54.     Defendant knew that its actions constituted an unlawful violation of the FMLA and/or showed reckless disregard for plaintiff's statutorily protected rights.

## SECOND CAUSE OF ACTION

### Sex Discrimination Under the Executive Law

55.     Plaintiff repeats and realleges paragraphs 1-54 as if fully set forth herein.

56.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex and pregnancy in violation of the Executive Law.

57.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendant's discriminatory acts.

## THIRD CAUSE OF ACTION

### Sex Discrimination Under the Administrative Code

58.     Plaintiff repeats and realleges paragraphs 1-57 as if fully set forth herein.

59.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex and pregnancy in violation of the Administrative Code.

60.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendant's discriminatory acts.

61.     Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)     declaring the acts and practices complained of herein are in violation of the Executive Law, the Administrative Code, and the FMLA;

(b)     enjoining and permanently restraining these violations of the Executive Law, the Administrative Code, and the FMLA;

(c)     directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendant to reinstate plaintiff to the position she would have occupied but for defendant's unlawful conduct and making her whole for all earnings she would have received but for defendant's unlawful conduct, including, but not limited to, wages, pension, 401(k) contributions, bonuses, and other lost benefits;

(e)     directing defendant to pay plaintiff punitive damages as provided by the Administrative Code;

(f)     directing defendant to pay plaintiff liquidated damages for its violation of her rights under the FMLA;

(g)     directing defendant to pay an additional amount to compensate plaintiff for the emotional distress defendant's unlawful conduct has caused plaintiff;

(h)     awarding plaintiff such interest as is allowed by law;

(i)     awarding plaintiff her reasonable attorneys' fees and costs; and

(j)     granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.


Dated: New York, New York
        June 30, 2004

                                    VLADECK, WALDMAN, ELIAS
                                        & ENGELHARD, P.C.

                    By: _____
                                    Judith P. Vladeck (JV 2908)
                                    Kevin T. Mintzer (KM 4741)
                                    Attorneys for Plaintiff
                                    1501 Broadway - Suite 800
                                    New York, New York 10036
                                    (212) 403-7300